Judge Oldham, who had a pressing engagement out of town, but he's fully engaged in the case today. There's an awful lot of feedback and reverberation. I guess we can't do anything about it, but speak directly to the microphone, please. We have a couple of very interesting cases this morning. We also have time limits that we hope you will try to adhere to, unless you're answering questions from the court. We have read the briefs and record excerpts. We have not necessarily been into the record on the cases, so we appreciate record citations. The first case of the morning is No. 24-20142, Anderson v. Estrada, and we'll hear first from Mr. Page. Is that right? Oh, I'm sorry, Mr. Ford for Page, right. Okay. Thank you very much, Your Honor. Good morning, and may it please the Court. My name is Robert from a denial of a Rule 12b motion to dismiss, and an additional trio of Rule 12c motions for judgment on the pleadings, in which the district court denied, at the pleading stage, the applicability of qualified immunity in the successive force case. Excuse me, there's something wrong with the timing here. Who's representing Mr. . . . Okay, we have three lawyers who are going to speak on the plaintiff's side. Is that right? That's correct, Your Honor. Oh, okay. Sorry. So, are you representing just Mr. Ford? I'm Mr. Ford, and I represent Deputy Victor Page, Your Honor. I'm sorry. That's quite all right, Your Honor. That's a lot of names to keep straight. Okay. Well, what about the other defendants? Your Honor, they have tendered their argument times to me, so I am arguing on behalf of appellants. However, my colleague, Mr. Jim Butt, who represents Deputy Ella Beatty, has requested . . . I'm sorry. Pardon me. . . . has requested an additional five minutes. Okay. I'm sorry. This . . . Okay. I apologize, Your Honor. I probably needed a slide ruler to get that argument division straight. Okay. Thank you. Yes, Your Honor. In any rate, this appeal essentially presents one gravamen issue and two sub-issues under that. The issue du jour is whether, under the Supreme Court's and this circuit's precedent, it can be said that Drive Stunning, with a taser, an actively resisting suspect who, at the time, was high on PCP, and after attempting for nearly twelve minutes to secure his compliance to enter a vehicle, violated that suspect's clearly established constitutional rights. Underneath that issue, Your Honors, are really two issues that I think will detain the Court today. Number one is whether the District Court erred in failing to adequately consider the video evidence that was made the subject of plaintiff's pleadings, and instead accepting as true the naked allegations in plaintiff's pleadings, even when those naked allegations were, to use this Court's precedential language, blatantly contradicted by the very video that pleading cited. Secondly, is the issue of whether and to what extent Mr. Anderson, the decedent, was either actively or passively resisting under this Court's jurisprudence. Your Honors, I will say, unless I'm being too presumptuous, I think the first sub-issue of whether the video was properly before the District Court and ought to have been considered under this Court's judgment was decided by plaintiff's and intervener's appellees' brief to this Court. Much like their pleadings in the trial court below, I'm sure Your Honors noticed that the appellees excerpted whole swaths in still images of the very video that we contend ought to have been considered because several critical portions of that video blatantly contradict the facial allegations upon which the District Court apparently relied in reaching its conclusion to deny qualified immunity. The more important issue, as far as I'm concerned, to the extent that matters, is the distinction between the passive and active resistance. The active resistance and passive resistance delineation was set forth by this Court, I think, most explicitly in the DeVille v. Marcantel case in 2009, that's 567 F. 3rd 156. Of course, the distinction between passive and active resistance is important because it derives from the very elements that we are called to consider in qualified immunity cases under the Graham factors. One of the Graham factors asks whether and to what extent a suspect was actively resisting. Of course, that implies that if a suspect is only passively resisting, force is generally not warranted. Here, it is, in fact, actively resisting. I want to recite to Your Honors a few facts that are in the record, and I will provide record sites to assist Your Honors. Number one, it is beyond dispute because it is in the record, and I'm referring to Record Excerpt 24-20142.167, that for no less than 12 minutes, the decedent, Mr. Anderson, was to enter into the Chevy Tahoe that eventually Deputies Alibade, Page, Estrada were required to forcibly put him into. Do we know why he had been transferred from the scene of the crime to the gas station and then into the Tahoe? Your Honor, the record on this is admittedly a bit muddled. I will offer what I think you can reasonably deduce from the record. There is dialogue in the video, and specifically I'm referring to Timestamp 427 in the video from Ms. Estrada's, Deputy Estrada's body-worn camera footage, in which they have a dialogue at the initial scene about the need to clear the roadway because, recall, this accident was a one-car accident in which the vehicle, the white Mercedes Benz that Mr. Page, or pardon me, Mr. Anderson was operating, actually crashed in the wrong way. It apparently had been traveling the wrong way in the middle of the street, and it was obstructing traffic. And this was, at the time, nearly four in the morning. So at that point, they made the decision to take him and transport him to the gas station adjacent to the scene. I would also suggest, for what it's worth, that he was still in custody under suspicion, among other things, and I'll get to that, of driving under the influence. And he had admitted that he had been driving under the influence of SHRM, a commonly known street moniker for the substance PCP. Everyone in the case acknowledges that the decedent was under the influence of PCP. So that is not a fact in dispute. So I suspect that another need to take him to the gas station was to further administer field sobriety tests, and or perhaps even to secure toxicology. There is also dialogue in the video where Deputy Alibady is asked by Deputy Estrada whether it is time to go ahead and do a blood draw, and he advises her to hold off, let's wait and see what the DA says. And so that's my honest deduction. At any rate, yes, Your Honor. Let's wait and hear what somebody said. I didn't hear that. I apologize, Your Honor. I just didn't hear it. Not at all. That was a comment made by Deputy Alibady, who is one of the defendant appellants in this matter, to a fellow defendant appellant, Deputy Estrada. So at any rate, in addition to the 12 minutes of attempts to secure compliance through cooperation in non-enforceable means, there were no less than 38 verbal commands issued to Mr. Paye, or to Mr. Anderson, forgive me, to enter the Tahoe voluntarily. No less than 38. And in fact, those 38 commands culminated in Mr. Paye, or Mr. Anderson, when Deputy Alibady threatened to tase him, this culminated in Mr. Anderson saying or exclaiming, tase me. And he actually exclaimed that no less than 25 times prior to actually being drive stunned. And another thing that is important to clarify, Mr. Anderson was not tased, as this court has recognized in Stone v. Cloud, which we cite in our brief. There is a distinct and meaningful difference between drive stunning and tasing. Drive stunning involves the officer, as this court has observed in Stone v. Cloud, removing the cartridge containing the conductive hooks from the taser, and essentially utilizing the taser only as a means to secure pain compliance. It does result in a fairly significant amount of pain to the surface area of the skin where the drive stun is applied. Is there electrical conductivity into the body? There is no electrical conductivity into the body. And so, that's also an important thing to note. At any rate, I would contrast these facts, and additionally the facts that are completely apparent from the video, to the facts of the three, what I would call, yes, Your Honor. Well, let me ask one, because they allege that some autopsy report says he died because of the drive stun. But is there any support in the, it's a 12B6, so that's just an allegation? That's correct. So, I have a few things to note about that autopsy report. First, and I'm happy to be corrected by opposing counsel, that autopsy report was not appended to their pleadings, and thus was not before the district court to be considered at the Rule 12B and Rule 12C stages. Moreover, that autopsy report specifically says that the cause of death was, number one, PCP toxicity, number two, arterial sclerotis, pardon me, which is a rigidity of the arteries, typically attendant to high cholesterol, blood pressure, and coronary disease, and the effects of struggle on his heart, along with being drive stunned. But again, to be clear, that, to Your Honor's point, was not properly before the district court, and it's not properly before this court. As I, as I, as my opening time expires, I just would draw a contrast between the three, what I would call passive resistance cases that this court has enunciated recently. Those three cases are DeVille v. Marcantel, Hanks v. Rogers, and Trammell v. Frouge. The facts of those cases could not be more disparate from the one we have here. DeVille, the first case, involved a 45-year-old grandmother, registered nurse, pulled over in North Louisiana under suspicion of driving 10 miles over the speed limit, and upon ignoring two requests to exit her car because she needed to stay with her grandchild, the window was broken through. And that, this court held, was passive resistance because she was not in any way actively resisting the deputies. Your Honors, my time has expired for this opening round, so to speak. I'm going to, unless Your Honors have questions, I'm going to sit down and allow Mr. Butt to have his portion of the time, and then I'll get back up for rebuttal. I'm sure you'll have rebuttal time. Thank you, Your Honor. Good morning. My name is Jim Butt. I represent Crystal Estrada. A few points I would like to add to my colleague's presentation. First, Mr. Anderson was 232 pounds, 6 foot 4. At a certain point in the interaction with the deputies, he had exhibited violent thrashing in Estrada's vehicle at 437 on her body cam. The interaction with the deputies and Mr. Estrada was measured and ascending. It began with conversations such as, just sit and chill. And it was Mr. Anderson who first mentioned the taser. And he said, tase me. Fensiclidene and methamphetamine. Well, how is Mrs. Estrada responsible, could she be responsible for excessive force? Was she one of the people pushing him and trying to pull him, or is she the one negotiating with him, or what? She was the first officer on the scene, and she did summon medical care for him initially, and that did happen. As to bystander liability, which is the only claim against her, I would submit to the court the three issues, knowledge, presence, and opportunity, do not apply to her, because she was walking to her vehicle at the moment the drive-stun occurred with Al-Abidi in the back of his Tahoe, and that's on the record at 1553. It's her body cam video number two. So she was not participating in it, and she had no knowledge of it, and she had no opportunity to intervene in that part of the interaction. Judge Oldham has noted in his dissent and concurrence in Boyd v. McNamara that it is very difficult for officers to follow the precedent of this circuit, because it is an indeterminate corpus of precedent, and there are cases which go in our direction and go in the appellee's direction. Bystander liability? Well, certainly as to the use of the drive-stun and the taser. Again, I frankly don't see how your client can be connected with the tasing at all. That's true. I don't either, and I submit that she certainly should have been dismissed by the court. But even addressing the drive-stun by Al-Abidi, Salazar v. Molina, Ramirez v. Escajeda, Poole v. Shreeport, Betts v. Brennan, all of these cases seem to present at least a quantum of support for Al-Abidi's use of the drive-stun taser. The drive-stun actually is a localized tool for pain compliance, and it does not incapacitate or affect the central nervous system, but it does present a shock to the skin. So unless there are any other questions, I am going to surrender my time. We're at 12B-6, right? And 12C, yes, Your Honor. Okay. Your clients, depending on the outcome of this, if any of this motion, order of the district court is affirmed, then it would go back for some sort of evidence, and then we could be back here on summary judgment. That's true. It could be another round. Yeah. All right. I get any questions. Judge Oldham? No, sir. Thank you.  You have time for rebuttal. Okay. Next, we'll hear from Mr. Edwards. Good morning, Judge, and may it please the Court. No reasonable officer would have drive-stunned a detainee four to five times, including in the neck, when that detainee was handcuffed, nonviolent, confused from a head injury, and not resisting with anything more than a passive immobility of his legs. And at this stage, on a Rule 12B-6 motion, we take those allegations as true. The question before the Court is not just whether Mr. Anderson presents a threat. The question is whether, taking the well-pled facts as true, any reasonable officer could believe it was lawful to punish an unarmed and subdued man with repeated pain-compliance drive-stuns when he posed no immediate danger. This Court has clearly held, in cases like Trammell and Newman v. Guidry and Ramirez v. Martinez and Bush v. Strain, that drive-stunning or using excessive force against a subdued, nonviolent individual violates the Fourth Amendment. And this law was clearly established well before 2021. Do we have any case that specifically touches with drive-stun as opposed to taser? I think Trammell v. Frug comes close, Judge. I think that the suspect . . . Well, it's either a drive-stun or it's not. That's what I'm saying. Correct. And a drive-stun actually is, I believe the Cloud v. Stone case was recently cited to this Court, and it was cited by the District Court at 2680, and the Court specifically says at footnote 3 that this method of tasing, referring to drive-stunning, inflicts a painful electrical shock on contact, but does not cause the same seizing. So there is an electrical shock on contact when using the drive-stun. We also do not believe that this is a moment of threat situation where Mr. Anderson suddenly presents a threat and a split-second decision has to be made. This is unlike the facts that we found in Barnes v. Felix, where the officer in that case shot a suspect or a detainee while a vehicle was moving. And this Court found that in that moment, the officer could reasonably anticipate there could be a threat to his person or to his life, and therefore the force used in that case was deemed to be non-excessive. The District Court applied the correct legal standard and found that even on the pleadings alone, the allegations are enough to overcome qualified immunity. That ruling should be affirmed. In Trammell v. Frug, the Court held that drive-stunning a subdued, handcuffed person for passive resistance violates the Fourth Amendment. And that's what our District Judge in this case found, is that at most, there was a passive resistance. What do you mean by passive? I watched this video. I watched the critical 20 minutes approximately. And once they were trying to get him into the SUV, he's a big, big guy. He's bigger than either of the officers, the male officers. He's much bigger than the females who aren't participating. He's not, he won't get in. He won't get in. And then, he's with his legs out, hooked under the door of the car. And they're saying, and finally they say, and I don't recall right offhand who said it, at some point he does say, tase me, but he's thrashing and, you know, messing about the whole time. He could have broken one of their arms when they were trying to, because just from his body propelling itself down onto one of their arms as they're trying to pull him and push him in. Respectfully, Your Honor, I think the court has identified maybe some issues of fact, which No, that's on the video. I'm just characterizing them. Okay. And I suppose the appellants and the court below would have a different characterization of that level of resistance. But passive resistance is defined for us. Those are physical actions or lack thereof that passively prevent or attempt to prevent the employee's attempt to control. That here, the employee would be the Harris County deputy. It is a common tactic of civil disobedience and labor disputes. For example, a subject who remains limp, stiff, or in a prone position, refuses to comply with simple directions, participates in a sit-in, locks their arms, or blocks an entryway. Well, that may be the case in a sit-in. But this is not a sit-in. This is a fellow who just rammed his car across the street, blocking the street with his DUI incident. He's high on PCP. The officers know that. They keep having to bring EMS out to look at him. And because of his mind or the problems with his body and what he's ingested, he's not acting rationally. And these other cases of passive resistance are people where they gain control of the person and then they continue to beat him, basically, which this isn't. This is just gaining control. So he was under control, Your Honor. We believe he's under control because both of his hands are handcuffed behind his back. He is surrounded by four deputies. He's being held down by two of the deputies who are guys who were just about as big as he was. And there were two other deputies who witnessed all of the events. That's my time, Your Honor. May I do a quick close? Go on. You know, if you have something more to say, go ahead. Well, I just want to say that in this case, the deputies had time. They had the numbers. They had the tools available to them if they wanted to immobilize Mr. Anderson's legs. Deputy Garcia even requested, should we use leg irons? And she was ignored. So they knew they had tools available that they could use less intrusive than a taser or a drive stun, which these employees had been warned. If you encounter someone who's on a controlled substance, the chance of a severe cardiac event rapidly increases by application of a taser. May it please the court. Well, now, is that in your allegations? That is correct, Judge. That's policy 503, which we have incorporated. We included it in our amended complaint. Okay. All right. Thank you. All right. Mr. Ketker? I take it you represent the parents? Yes, the intervenors, Mr. Anderson's, the decedent's parents. J. Ketker for appellees. May it please the court. The district court did not err in denying Deputy Alibide's motion to dismiss based on qualified immunity. There are two primary reasons why the district court did not err. One is this court's decisions in Trammell v. Frugge and Ramirez v. Martinez, and the second is the Harris County Sheriff's Office's own policy 503, which is in the complaint in pages 285, 286, and 287. I'll mention that one of the complications in qualified immunity cases, and I think Judge Jones, you referenced it or labeled it as the hazy border problem in your dissent in Ramirez v. Martinez, is the reason for qualified immunity is oftentimes law enforcement officers have to make life or death decisions in split seconds. And many of the cases in which qualified immunity was recognized and claims were dismissed or summary judgment was granted against a plaintiff, it was oftentimes where these law enforcement officers have to make those split second decisions and we should not second guess or play Monday morning quarterback with the officer's decisions. And the officer should get that leeway. This is not what you refer to as a hazy border case. What happened in this case, the use of excessive force here, the use of a taser, was at the end of a near 90 minute detention of Mr. Anderson. There was no, and at the time the excessive force was used, there was no reasonable threat upon the officer's physical safety or especially there was no threat against their livelihood or threat against their life. So I want to make that clear because a lot of the cases that appellants rely on to support their position that this court should dismiss plaintiffs and interveners claims are those hazy border cases where the officer was acting in a situation where the status and of the suspect was unknown, where it was not entirely clear whether the suspect was unarmed. There were such times when the suspect was not restrained or was not handcuffed. And so the officer in those cases had to make that split second decision to use a force such as a taser or use extreme physical force in order to get a suspect to comply and to get detained. In this case, Officer Alibide or Deputy Alibide had actual knowledge that it was possible to get Mr. Anderson into the car because it had been done less than an hour before he was tased or an hour before the excessive force here was used. At the initial scene, the deputies got Mr. Anderson into the vehicle and he was detained and he was no longer a threat to any officer or anybody. Well, he did bounce the vehicle up and down, didn't he? Correct. And I think that would suggest that you either call, you know, Deputy Alibide should have called medical attention or at least not gotten him out of the car because the suspect is demonstrating some sort of aggressive behavior, then don't, you know, Alibide should not have created a situation in which, you know, undoing the situation where he was already detained, undetaining him. I don't quite understand. I assume there's, all we know is that they started him out in a small cruiser and apparently at the gas station he started shaking himself up and down so much so that the cruiser was unstable. Well, I wouldn't want to drive someone to the police station if my passenger is shaking my car around. That's not safe, right? And that is a fair conclusion, Judge Jones, but the solution to that problem is not to extract him from the vehicle so that he can possibly present a danger to the deputies because that would only increase the need to use force again when we can maintain a situation where— I think the Supreme Court has said that you look at the events, you understand the whole background of what's happened in order to impose liability, but you do look at the events immediately surrounding the use of alleged excessive force. So I'm not quite sure what you're saying about the—the video that I watched is the 12 minutes when Mrs. Stradi, I suppose, is negotiating with him to give him water if you put your feet in the car, if you put your feet in the car, if you'll sit in the car, and so on. You know, so—and then when they're saying—they finally stop that after about 9 or 10 minutes and they try to get his feet in—I mean, I'm sure you've seen it many times as well. Right, Your Honor, I don't— I don't consider—I don't think—I don't think active and passive resistance necessarily have to be determined in terms of danger to the officers so much as danger to the mission that they're trying to accomplish, which is to detain him and take him to the jail, which he doesn't want to do, evidently. Well, Your Honor, a couple of things. First, I don't want to be too presumptuous because the issue of what set of circumstances or what the court should look at is currently before the Supreme Court out of this case in Barnes v. Felix, so—but as far as what this court has done is it's used the moment of threat test. And so using that test, I still think that plaintiff's claims and the intervener's claims survive because in the situation when the excessive force was used, he was not—Mr. Anderson was not being attempted to be put into the car. He was actually pulled out of the car and put face down, handcuffed, and then tased. And as far as this court's precedent goes, in Boyd v. McNamara, this court said Trammell and Ramirez put an officer on notice that he could not constitutionally fire a taser at a nonthreatening, passively resistant subject. And on the subject of passive resistance, the delineation between passive and active, I think it does need to incorporate whether or not the resistance is a threat to the officers because oftentimes in this court's decisions, when it's recognized that the resistance was active in terms of the suspect was presenting a threat by attempting to physically strike or harm an officer, that officer's use of force was justified in order to subdue the suspect. So it's not just the mission that the officers are on. You should also evaluate the threat posed by the resistance. Passive resistance, such as acting as dead weight or going limp, surely makes the job more difficult. But I see my time is up. May I finish my statements? Passive resistance, while clearly not compliant, it does not pose a threat to the life or safety of an officer. Whereas active resistance, such as striking, hitting, drawing a weapon, would pose a threat to the officer and might justify the use of force. But in this case, it doesn't. It was a clearly established violation as this court has held in Boyd, Trammell, and  All right. Counsel, can you hear me? Yes, Your Honor. Counsel? Oh, sorry. I just wanted to ask one quick question before you sit down. You said earlier that when the decedent was violently thrashing the car and moving, the car was bouncing around, that it was a danger to get him out. And obviously, he was being quite aggressive, if I remember your words correctly. Is your position that he was actively resisting then, but he was not actively resisting when he was tased? Or is your position that the violent thrashing, the bouncing, and the threat to get him out of the vehicle, that was still passive resistance even then? Does the question make sense? Let me, Judge Oldham, just to make sure I understand your question, are you asking at least first whether his activity in the vehicle when he's thrashing about, is that resistance? Is that your question? Is that active resistance? He's obviously not limp. Your argument a few minutes ago was that it was dangerous to get him out of the vehicle, that they also should have left him in there. And we can all see on the video that the vehicle is bouncing, right, when he's in it. Was that active resistance or passive in your view? Well, I reject the premise that it was resistance at all. At the time he's in the vehicle, he has been detained. He certainly, while he's in the vehicle, he certainly poses no threat to the officers or anybody in the vicinity. So I don't think it's passive or active resistance because there's no resistance at all. The deputies have successfully subdued and detained him, and he presents a danger to no one. At least certainly not the deputies. You said it would have been dangerous to get him out. Correct. So if, because in the video footage, there is clearly difficulty getting Mr. Anderson into the vehicle the first time when they're at the initial scene. So having actual knowledge of that, the officers should not create a situation that would necessitate use of force after the suspect has already been secured and detained, and he's no longer a threat to anybody. So your position is they should have just left him in there and forgot about him? Certainly not, Your Honor. I think what they should have done is if they waited for him to calm down so they could drive him in, or at least call, if he's demonstrating behavior that indicates that he might need medical attention, they should call medical attention. In the case where they're at the gas station in the video, medical attention arrives and then is dismissed without having the opportunity to check Mr. Anderson. So they should check on him, open the door, make sure he doesn't need medical attention. So they need to expose themselves to the thrashing and the bouncing and everything else, but just a little bit. Well, they can wait for him to calm down to see if he's compliant, but at the time they extracted him from the vehicle, it was merely moments after he was demonstrating that behavior. I appreciate it. Thank you for your grace with my questions. Thank you for this panel's time. All right. Thank you. Ms. Catby? Good morning, Your Honors, and may it please the Court. My name is Iman Catby. No reasonable police officer would think that it was constitutionally permissible to watch as a fellow officer repeatedly drive-stunned a visibly injured man who was confused, handcuffed, subdued and unarmed. First, I would like to address my friend Mr. Butt's issue regarding Deputy Estrada. The first thing that I would like to point out is that my friend mentioned that at her body cam video, 452, she was heading to her car. However, Page's body cam video, which is at 1671, at 4.50 to 4.51 a.m., shows that that is when the tasing happened. Further, the taser report at, sorry, the taser report, which is at 3.161, states the tasing began at 5.02. There is a timing issue, and at this stage, all doubts as to facts should be resolved in favor of the appellees. Second, with respect to Judge Jones' question regarding threat to the officers, the Graham factors actually do say one of the factors is a threat to the officers as opposed to the mission, respectfully, Your Honor. Well, we, we, Graham was deadly force, right? Graham did result in a fatality just as this one did, yes, Your Honor. Yes. And it is not clear that you didn't plead deadly force in this case. You pleaded excessive force, I believe. Yes, Your Honor. And in the case of excessive force, we have a lot of cases where the officers are trying to arrest a fellow, and he says, I ain't going to jail, and they sometimes have to punch him in order to arrest him, and we have given qualified immunity under those circumstances. So, the difference between those cases and this case is, is the drive stun, and whether that has an additional impact or, you know, weight in regard, of force compared to punching the guy, and nobody could have punched out this guy high on PCP. Respectfully, Your Honor, so in the Austin v. City of Pasadena case, there was drive stunning, and qualified immunity was denied in that case, Your Honor. There was drive stunning as well as tasing, and so there was a variety of different excessive force, and the Supreme Court does not necessarily delineate between drive, neither the Supreme Court nor the circuit necessarily delineates between drive stunning and tasing. And furthermore, in the case, Supreme Court case Hope v. Pelzer, which is an excessive force and bystander liability case, the Supreme Court states that fundamentally similar facts are not required to defeat qualified immunity. Novel circumstances are acceptable as long as the officials are on notice. These officials were on notice that they should not be tasing an individual who may be on drive stunning, an individual, and turning to bystander liability, since I have two and a half minutes really quick. Policy 501, which is also referenced in our amended complaint, states that if you see excessive force, you need to intervene. Page was standing next to Deputy El Abadi, so he definitely had an opportunity to intervene. He saw the excessive force, and if Your Honor's find that this is excessive force, he definitely saw that excessive force. And appellees have satisfied their burden to plead the facts. At this stage, we do not have to prove the facts. We simply have to plead the facts that would infer qualified immunity. Furthermore, with respect to Deputies Estrada and Garcia, there is doubt as to whether, first turning to Estrada, there is doubt as to whether Deputy Estrada could, was able to see during the tasing incident, or the drive stunning incident. You can see on Page's body-worn camera footage, there are two people who can clearly see what is happening, because Anderson, El Abadi, and Page are at the back driver's seat door, and two individuals are standing at the open window or open door. You're supposed to get him into the car. Your Honor, there are, they could have been patient. He was actually sitting in the car. He was a patient for 12 minutes. I've not seen a case recently where the police were negotiating with a fellow who's high for 12 minutes. Your Honor, there is crisis intervention response that should be used for a drug that is specified in the Harris County. Qualified immunity, if they chose, if they didn't call crisis intervention response, because there's no case that says that's constitutionally required. Yes, Your Honor. However, there are cases that say that it is constitutionally impermissible in the face of passive resistance to use any sort of force. There was no act of resistance in this particular situation. He did not attempt to attack them. He did not attempt to flee. He was actually inside the vehicle, and then El Abadi and Page dragged him out of El Abadi's vehicle to tase him. So this was passive tase him. They dragged him out because he was not, they couldn't close the doors to the car. So at that point, there is a potential mischaracterization of the facts between the- I looked at the video. I mean, and maybe I've got the timing wrong, but as I recall, he's six foot four. He is wider than the SUV is, or at least where his head is positioned. His feet are sticking out. They don't want to break his legs by slamming the door shut, and they pull him out. Your Honor, I see that my time has- Go ahead. Please. No, you can respond. Yes, ma'am. Yes, Your Honor. And so- If I'm wrong about the video, please tell me. So I'm respectfully, I'm not sure I would say necessarily you're wrong about the video. They are trying to put him in the vehicle. However, first, the fact that he is stiffening his body does not mean he is actively resisting. And with respect to what are they supposed to do to get him in the car, Your Honor is correct. There isn't a particular court that tell, or case law that tells us this is how he's supposed to get in the car. However, there is case law that says if you don't have active resistance, you don't use force. And further- What's your best case for that proposition? Trammell v. Frug, Your Honor, and Newman v. Goodry. Let me ask you one other question. Yes, Your Honor. You mentioned something, Austin, something v. City of Pasadena. Yes, Austin v. City of Pasadena. I don't see that referred to in your brief. Could you give me a cite? Yes, ma'am. And if you don't have it right here, you can file it after argument. Yes, ma'am. So- I mean, it's perfectly fine to cite it. I just didn't see it in the brief, and I could have been wrong. Yes, Your Honor. Thank you, Your Honor. May I file a 28-J note with this court, Your Honor? Yes, please. Thank you, Your Honor. Okay. For these reasons, we respectfully request that this court affirm the lower court. Thank you. Thank you, Your Honor. Okay. Mr. Ford. Thank you, Your Honor. Your Honor, I seek the counsel's notes. If you don't mind, please, the court, I will return those to them. Thank you, Your Honors, and may it please the court. Your Honor, you requested the cite for the Austin v. City of Pasadena case. That cite is 74 F. 4th 312. That case, we would contend, is largely an apposite. It involved the use of a taser to try to subdue a detainee who was actually undergoing an epileptic seizure in his jail cell. So we would contend that is not terribly opposite to what we're dealing with here today. Moreover, I would note that on page 327 of Austin v. City of Pasadena, the court took great care to note that it had, in fact, denied qualified immunity and found excessive force in taser cases, but in each of those cases, and it cites a string cite which includes each one of the cases that appellees have cited today, Bush v. Ramirez, et cetera, the court noted that in those cases, the reason they denied qualified immunity was because the subject was only passively resisting as opposed to actively resisting, which brings us back to the very issue, again, Your Honors, which we started with and which I would like to conclude with as I began. Passive versus active. Your Honors, you really need to only focus on four cases, and they're yours. The first is DeVille v. Marcantel. That was the 45-year-old grandmother registered nurse that I referenced earlier. She was pulled over under suspicion of driving 10 miles above the speed limit. She refused two directives, just two, from local law enforcement to exit her vehicle because she refused to do so until her husband arrived on scene to take custody of her grandchild, who was in the car with her. In response to refusing merely two requests and sitting there, not flailing about, not engaging in activity that could potentially injure herself, another occupant, or the officers trying to subdue her, in response to that, the officers smashed in her window with a black metal flashlight. The other two are Hanks v. Rogers. Again, another minor traffic violation case. The site is 853 F 3rd 738. It's a 2017 decision from this court. Again, the subject was pulled over for going 20 miles per hour over the speed limit. The encounter lasted less than one minute, and I'm going to get to this temporal piece in a second. His resistance, as described by this court, consisted of remaining on his feet for 20 seconds after being ordered to kneel. The officers rushed toward him and executed what was described as a half-spear takedown. Okay. Well, just make it short. Yes. Yes, Your Honor. And finally, the Trammell v. Fuge case. The initial encounter lasted only three seconds until the force was used. Why did I go into these facts, Your Honor, and I appreciate Your Honor's forbearance? Because the touchstone I would submit of this court's jurisprudence on passive versus active aggression is twofold. Number one, the sit-in analogy that my colleague on the other side rightly analogized to. This is not an instance of a sit-in. A sit-in is what occurred at DeVelle v. Marcantel with a grandmother sitting passively in the driver's seat waiting for someone else to arrive. This was 12 minutes of thrashing, flailing, kicking. The video even references efforts by the subject to utilize the door as leverage to try to gain leverage over the officers attempting to subdue him. Let me ask you one thing. Yes, Your Honor. They said, they plead that one of the officers said they might have used leg irons on him. Your Honor, I have heard that contention a number of times. I will be quite honest with you, I have not been able to independently verify that in the record. I am not in any way insinuating that counsel is misrepresenting the record. I just have not heard it and I have watched that video more times than I care to concede. But if Your Honors are able to find it, I apologize. The other reason time is the touchstone of Your Honor's analysis regarding active versus passive is because it relates to this court's corollary that officers are supposed to use the quote-unquote measured and ascending efforts to secure compliance before elevating their efforts to one of force. What you saw or what you have seen to date in that twelve-minute stretch of the videos that are on record with this court are precisely the measured and ascending conduct that this court has prescribed our law enforcement officers to use before upping the ante, if you will, in going to force. I mean, it's certainly possible that if they had been able to subdue Mr. Anderson quicker or if he had complied quicker, he would have gotten to the jail and he would have gotten EMS treatment and might have survived. That's exactly right, Your Honor. And the video actually reflects that he refuses EMS treatment on a number of occasions and refuses to cooperate with EMS personnel who are trying to assess his condition. And lastly, Your Honor, you asked about drive stunning. I'm sorry. I'm out of time. Go ahead. Answer it. You asked about drive stunning. Cloud V. Stone is directly on point with respect to drive stunning. And in that case, the only predicate that this court recognized as sufficient to allow qualified immunity in that case was the suspect, when ordered to place his right hand behind his back to complete handcuffing, pulled away, turned around, and to use this court's terms, squared up with the officer. At that point, the officer tased him, then drive stunned him, and then subsequently shot and killed him. And at the time of the tasing and drive stunning, the subject was not known to be armed. The officer subsequently shot and killed him because he discovered that the person had a revolver in his possession. But at the time of the tasing, because the court did a segregated analysis, a discrete All right. Thank you. Thank you very much, Your Honors. All right. Thank you both. Thank you.